```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   ALEXANDRIA DIVISION

 3  UNITED STATES OF AMERICA,    )  Case 1:24-cr-141
                                 )
 4              Plaintiff,       )
                                 )
 5        v.                     )  Alexandria, Virginia
                                 )  June 21, 2024
 6  ROBERT WESLEY ROBB,          )  2:33 p.m.
                                 )
 7              Defendant.       )
    _____)  Pages 1 - 46
 8

 9             TRANSCRIPT OF PLEA HEARING AND

10    MOTION TO RELEASE FROM CUSTODY AFTER ENTRY OF PLEA

11        BEFORE THE HONORABLE ANTHONY J. TRENGA

12           UNITED STATES DISTRICT COURT JUDGE

13
    APPEARANCES:
14
    FOR THE PLAINTIFF:
15
         KATHERINE E. RUMBAUGH, ESQUIRE
16       A. ZOE BEDELL, ESQUIRE
         OFFICE OF THE UNITED STATES ATTORNEY
17       2100 Jamieson Avenue
         Alexandria, Virginia  22314
18       (703) 299-3700

19  FOR THE DEFENDANT:

20       ANN MASON RIGBY, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
21       1650 King Street, Suite 500
         Alexandria, Virginia  22314
22       (703) 600-0800

23  THE DEFENDANT, ROBERT WESLEY ROBB, IN PERSON

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

```
 1               P R O C E E D I N G S
 2          THE COURTROOM DEPUTY:  Criminal Case
 3  No. 1:24-cr-141, United States v. Robert Wesley Robb.
 4          Counsel, will you please note your
 5  appearances for the record.
 6          MS. BEDELL:  Good afternoon, Your Honor.
 7  It's Zoe Bedell and Katherine Rumbaugh for the United
 8  States.
 9          THE COURT:  Good afternoon.
10          MS. RIGBY:  Good afternoon, Your Honor.  Ann
11  Mason Rigby on behalf of Mr. Robb, who is present.
12          THE COURT:  All right.  I understand we're
13  here for a pre-indictment plea based on a plea
14  agreement and statement of facts and also Mr. Robb's
15  motion for release pending sentencing.
16          MS. RIGBY:  Yes, Your Honor, that's correct.
17          THE COURT:  All right.  Mr. Robb, would you
18  come to the podium and be sworn, please.
19      (The defendant affirms.)
20          THE COURT:  Would you state your full name,
21  please.
22          THE DEFENDANT:  Robert Wesley Robb.
23          THE COURT:  Mr. Robb, the purpose of this
24  hearing is to give you the opportunity to enter a
25  guilty plea to the charge of wire fraud.  If you enter
```

1  such a plea, it will be the responsibility of this

2  Court to ensure that your plea is being entered

3  voluntarily, that is, that no one is forcing you to

4  enter that plea against your will and that your plea is

5  not being entered in exchange for any promises or

6  agreements except those in your plea agreement.

7          The Court also has the responsibility to

8  ensure that your plea is entered knowingly, that is,

9  that you understand the consequences of pleading

10  guilty.

11          In order for the Court to make those

12  determinations, I'm going to ask you a series of

13  questions.  And for that purpose, you've been placed

14  under oath.  Having been placed under oath, you have

15  the obligation to answer all of the Court's questions

16  truthfully.  If any of your answers prove to be untrue,

17  you may be subjecting yourself to additional criminal

18  penalties, including those for perjury based on the

19  responses you give here in court today.

20          Do you understand that?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  What is your age?

23          THE DEFENDANT:  Forty-six.

24          THE COURT:  And what is your highest level of

25  formal education?

```
 1              THE DEFENDANT:  Some college.
 2              THE COURT:  You read, write, and understand
 3  the English language?
 4              THE DEFENDANT:  Yes.
 5              THE COURT:  And you're a citizen of the
 6  United States?
 7              THE DEFENDANT:  Yes.
 8              THE COURT:  And you've been represented by a
 9  lawyer in connection with this charge; is that correct?
10              THE DEFENDANT:  Yes.
11              THE COURT:  Have you met with your lawyer?
12              THE DEFENDANT:  I have.
13              THE COURT:  Has your lawyer explained to you
14  the charge against you and what the government must
15  prove in order to convict you of that charge?
16              THE DEFENDANT:  Yes, Your Honor.
17              THE COURT:  Has your lawyer explained to you
18  the consequences of pleading guilty?
19              THE DEFENDANT:  Yes.
20              THE COURT:  Have you provided to your lawyer
21  all the facts and information you know that may relate
22  to this charge?
23              THE DEFENDANT:  Yes.
24              THE COURT:  And have you discussed with your
25  lawyer any possible defenses you might have and what
```

1  would be required to prove those defenses?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Have you understood everything

4  your lawyer has told you?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Have you had all your questions

7  answered to your satisfaction?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Have you had any difficulty

10 understanding anything your lawyer has told you,

11 anything about the charge against you, or anything

12 about the nature of these proceedings, including why

13 you're in court here today?

14         THE DEFENDANT:  No.

15         THE COURT:  Have you been satisfied with the

16 services of your lawyer?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Do you think you've had enough

19 time to meet with your lawyer and discuss whether or

20 not you should be entering a guilty plea at this point

21 in the proceedings?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Have you been under the influence

24 of any drugs or medication or any other substance

25 that's affected your ability to understand anything

1   your lawyer has told you, anything about the charge

2   against you, or anything about these proceedings?

3           THE DEFENDANT:  No.

4           THE COURT:  Ms. Rigby, based on everything

5   you know, is Mr. Robb competent to enter a guilty plea

6   here today?

7           MS. RIGBY:  Yes.

8           THE COURT:  Do you understand that the charge

9   to which you would plead guilty is wire fraud?

10           THE DEFENDANT:  Yes.

11           THE COURT:  And do you understand that by

12   pleading guilty, you will be convicted of that charge

13   just as if you had gone to trial on a plea of not

14   guilty and were convicted by a jury?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Has your lawyer explained to you

17   the maximum punishment you could receive based on the

18   conviction that would result from your guilty plea?

19           THE DEFENDANT:  Yes.

20           THE COURT:  The maximum punishment you could

21   receive is a term of imprisonment of up to 20 years, a

22   fine of up to $250,000, forfeiture of any

23   offense-related assets, restitution with respect to any

24   victim losses, a special assessment of $100 that will

25   be imposed, and a period of supervised release of at

1  least 3 years.  Do you understand that's the maximum

2  punishment you could receive?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  I've mentioned supervised release

5  as a possible term of a sentence.  Supervised release,

6  if imposed, will begin after you've completed any term

7  of imprisonment.  It would have certain conditions that

8  you would have to satisfy.  And if you failed to

9  satisfy those conditions, you could be imprisoned for

10  all or a portion of your period of supervised release

11  even if you had successfully completed a portion of it.

12  Do you understand the nature of supervised release?

13              THE DEFENDANT:  Yes.

14              THE COURT:  Also, we've abolished parole

15  within the federal system.  So you will, in fact, serve

16  the full length of any term of imprisonment subject

17  only to a reduction of up to 15 percent based on good

18  behavior.  Do you understand that?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  I understand that you have

21  entered into a written plea agreement.  Is that

22  correct?

23              THE DEFENDANT:  Yes.

24              THE COURT:  Do you have that document in

25  front of you?

1                    THE DEFENDANT:  Yes.

2                    THE COURT:  Does your signature appear on

3     that document?

4                    THE DEFENDANT:  It does.

5                    THE COURT:  And you signed that document?

6                    THE DEFENDANT:  I did.

7                    THE COURT:  Did you read that document?

8                    THE DEFENDANT:  Yes.

9                    THE COURT:  Did you have all your questions

10    answered to your satisfaction about that document?

11                   THE DEFENDANT:  Yes.

12                   THE COURT:  Did you understand everything in

13    that document?

14                   THE DEFENDANT:  I did.

15                   THE COURT:  Did anyone threaten you or try to

16    influence you in any way into signing that written plea

17    agreement against your will?

18                   THE DEFENDANT:  No, Your Honor.

19                   THE COURT:  Is this written plea agreement

20    the entire agreement you think you have with the United

21    States government?

22                   THE DEFENDANT:  Yes.

23                   THE COURT:  Do you think you have any other

24    promises, agreements, or understandings in exchange for

25    your guilty plea that's not in this written plea

1  agreement?

2          THE DEFENDANT:  No.

3          THE COURT:  If you were to go to trial and if

4  after that trial you were convicted, you would have the

5  right to appeal that conviction and any sentence to a

6  higher court.  Under this plea agreement, you waive,

7  that is, you give up your right of appeal both as to

8  the conviction that would result from your guilty plea,

9  as well as any sentence imposed.  Do you understand

10  that you've waived your right of appeal under this plea

11  agreement?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Have you discussed with your

14  lawyer whether or not you should waive your right of

15  appeal?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Also, under this plea agreement,

18  the government agrees to make certain recommendations.

19  Those are only recommendations.  They're not binding on

20  the Court.  Only the Court will decide what sentence to

21  impose in this case.  Do you understand that?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Also, under this plea agreement,

24  you agree to the entry of a restitution order with

25  respect to any victim losses.  Do you understand that?

1              THE DEFENDANT:  Yes.

2              THE COURT:  Do you also understand that

3   you've agreed to the entry of a forfeiture order with

4   respect to any offense-related assets and to have that

5   forfeiture order entered without any constitutional or

6   procedural protections?  Do you understand that?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Have you discussed with your

9   lawyer the rights you have as somebody charged with a

10  crime and that you would give up these rights by

11  pleading guilty?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  You have the absolute right to

14  proceed to a trial on a plea of not guilty before a

15  jury of 12 United States citizens.  Do you understand

16  that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  In order to convict you of this

19  charge, that jury must unanimously find you guilty.  Do

20  you understand?

21             THE DEFENDANT:  Yes.

22             THE COURT:  You have a right to be

23  represented by a lawyer at that trial and at every

24  other stage of the proceedings.  If you could not

25  afford one, one would be appointed for you.  Do you

1    understand that?

2         THE DEFENDANT:  Yes, Your Honor.

3         THE COURT:  Also, you have the right during

4    trial to confront any witnesses that the government may

5    present and to challenge the admissibility of any

6    evidence the government may offer.  Do you understand

7    that?

8         THE DEFENDANT:  Yes.

9         THE COURT:  You also have the right to

10   present your own defense.  That would include the right

11   to require any person with relevant information to be

12   brought into trial and testify and to bring with him or

13   her any documents relevant to this charge.  Do you

14   understand that?

15        THE DEFENDANT:  Yes.

16        THE COURT:  You also have the right, as part

17   of your defense, to testify yourself.  You could take

18   that witness stand, be placed under oath, and testify

19   subject to cross-examination.  You would have

20   absolutely no obligation to testify.  You could remain

21   silent in the face of this charge, and if you decided

22   not to testify, the government could not force you to

23   testify or to incriminate yourself in any way.  Do you

24   understand that?

25        THE DEFENDANT:  Yes.

1          THE COURT:  Also, if you made the decision

2   not to testify, no inference of guilt could be inferred

3   from the fact that you decided not to testify.  You

4   would continue to be presumed innocent of this charge,

5   and the government would continue to have the

6   obligation of proving each and every element of this

7   charge beyond a reasonable doubt.  Do you understand

8   that?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  As I mentioned earlier, if after

11  that trial you were convicted, you would have the right

12  to appeal that conviction and any sentence to a higher

13  court.  Do you understand that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  By pleading guilty, there will be

16  no trial in this case, and all that would be left for

17  the Court to do would be to decide what sentence to

18  impose.  Do you understand that?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Having heard all of these rights

21  that you have and that you would give up all of these

22  rights by pleading guilty, is it still your decision to

23  enter a guilty plea here today?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  In addition to all of these

1    rights you will be giving up, there will be other

2    collateral consequences of your pleading guilty,

3    including the forfeiture of any right you might have to

4    vote, hold public office, serve on a jury, or possess a

5    firearm.  Do you understand that?

6            THE DEFENDANT:  Yes.

7            THE COURT:  You also have one other very

8    valuable constitutional right, and that is the right to

9    have this charge brought against you by way of what we

10   call an indictment, which is issued by what we call a

11   grand jury.

12            A grand jury consists of up to 23 United

13   States citizens.  In order to issue an indictment, at

14   least 16 members of that grand jury must meet, hear

15   evidence from the government, and at least 12 members

16   of that grand jury must decide there's probable cause

17   to believe you committed this crime.

18            That grand jury, after hearing the

19   government's evidence, may issue an indictment, but

20   it's possible they would decide not to issue an

21   indictment.  And if they decided not to issue an

22   indictment, the government could not bring this charge

23   against you.

24            Do you understand that?

25            THE DEFENDANT:  Yes, Your Honor.

1            THE COURT:  You have the absolute right to

2    insist on an indictment.  You also have the right to

3    waive an indictment and allow the government to

4    proceed, as they are doing here today, by way of what

5    we call a criminal information.

6            A criminal information is not an indictment.

7    It's simply a piece of paper that was prepared in the

8    U.S. Attorney's Office listing this offense.  No grand

9    jury has heard evidence.  No grand jury has made any

10   probable cause finding.

11           Have you discussed with your lawyer whether

12   or not you should waive a grand jury in this case?

13           THE DEFENDANT:  Yes.

14           THE COURT:  And have you decided to waive

15   indictment in this case?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Have you signed a waiver of

18   indictment form?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  Do you have that document in

21   front of you?

22           THE DEFENDANT:  I do.

23           THE COURT:  Your signature appears on that

24   document, and you signed that document; is that

25   correct?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Did you read, understand, and

3    have all your questions answered about that document?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Did anyone threaten you or try to

6    influence you in any way into signing that waiver

7    against your will?

8          THE DEFENDANT:  No.

9          THE COURT:  Counsel, based on everything you

10   know, is Mr. Robb competent to waive a grand jury in

11   this case?

12         MS. RIGBY:  Yes, Your Honor.

13         THE COURT:  Let the record reflect that based

14   on the responses of this defendant and the

15   representations of counsel for the defendant, the Court

16   finds and concludes that the defendant is competent to

17   waive a grand jury and that he has knowingly and

18   voluntarily done so.

19         Have you discussed with your lawyer how the

20   Court will go about deciding what sentence to impose in

21   this case?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Have you discussed what we call

24   the sentencing guidelines and how they pertain to you

25   and your offense?

1            THE DEFENDANT:  We have.

2            THE COURT:  As that name suggests, those are

3   only guidelines.  They're not binding on the Court.

4   The Court may impose a guideline sentence, or it may

5   impose a sentence greater than the guidelines or less

6   than the guidelines obligated only to impose a sentence

7   within the maximum punishments that I've described to

8   you.  Do you understand that?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  Also, the Court is not going to

11  be able to finally decide what the guideline sentence

12  is until after it receives a presentence report, that

13  you and your lawyer and the government has had an

14  opportunity to review and object to any information in

15  that report.  Do you understand that?

16           THE DEFENDANT:  Yes.

17           THE COURT:  In addition to the guidelines,

18  the Court is going to consider a whole range of other

19  factors, including the nature and seriousness of this

20  offense, your own personal history and characteristics,

21  and generally what sentence will be sufficient but no

22  more than necessary to constitute a just punishment and

23  to protect the public.  Do you understand those are the

24  kinds of considerations the Court is going to take into

25  account?

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Also, as I mentioned earlier, the

3    Court is not going to be bound by any recommendations.

4    So if you receive a sentence that is different than

5    what the government recommends or that your lawyer

6    recommends or if you receive a sentence that is

7    different than someone told you you're likely to

8    receive or that you're expecting or if you receive a

9    sentence that you just think is unfair in some way, you

10   nevertheless are going to be bound by your guilty plea,

11   and you will not be permitted to withdraw your guilty

12   plea after you hear what the sentence is.  Do you

13   understand that?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  In a moment, I'm going to ask the

16   government to tell the Court what evidence it would

17   present against you if this case were to go to trial.

18   I want you to listen very carefully to what the

19   government tells the Court.  Because when the

20   government is done, I'm going to ask you whether you

21   disagree with anything the government has told the

22   Court about your conduct.

23             Have a seat for a moment.  We'll hear from

24   the government.

25             MS. BEDELL:  Your Honor, the United States

1   and the defendant agree that the United States would

2   have proven the following facts at trial beyond a

3   reasonable doubt with admissible and credible evidence:

4           Beginning in or around November 22 and

5   continuing through in and around March 2024, in the

6   Eastern District of Virginia and elsewhere, the

7   defendant, Robert Wesley Robb, did knowingly devise and

8   intend to devise a scheme and artifice to defraud

9   investors and to obtain money and property by means of

10  materially false and fraudulent pretenses,

11  representations, and promises and for the purpose of

12  executing the scheme and artifice to defraud knowingly

13  transmitted and caused to be transmitted by means of

14  wire communications in interstate commerce certain

15  writings, signs, signals, and sounds, in violation of

16  Title 18, United States Code, Section 1343.

17          Specifically, on or about October 27, 2023,

18  the defendant, using an electronic device located

19  outside the Commonwealth of Virginia, transmitted a

20  message via the Internet to Investor A, an

21  individual --

22      (Reporter clarification.)

23          MS. BEDELL:  -- to Investor A, an individual

24  located in the Eastern District of Virginia --

25          I apologize.  I will try to slow down.

1           On or around September 4, 2023, using an

2  electronic device, Robb posted in his Friend.Tech chat

3  using the Internet, advertising an opportunity to

4  invest in a Maximum Extractable Value cryptocurrency

5  trading bot.  Robb invited individuals that had 100 to

6  200,000 plus sitting around and who wanted to

7  participate in some next-level MEV stuff to send him a

8  direct message to learn more.  A screenshot containing

9  Robb's representations on Friend.Tech is included in

10 the statement of facts.

11          On or about September 7, 2023, Investor A

12 sent a direct message to Robb's X account and discussed

13 the opportunity to invest in the MEV bot.

14          Robb explained to Investor A how the MEV bot

15 would work, how Investor A's investment would be used

16 as capital by the MEV bot to trade cryptocurrency,

17 i.e., not to fund Robb's personal expenses, and how the

18 origin of Investor A's investment must be obfuscated

19 and how Robb and Investor A would split profits.

20 Further, Robb described the MEV bot as capable of

21 delivering very high returns and assured Investor A

22 that this was a low-risk investment.  Additionally,

23 Robb insisted that Investor A must invest within a day

24 or two because he expected the bot to be operational

25 soon, like early next week.  Screenshots reflecting

1   these conversations are included within the statement

2   of facts.

3           On Telegram, Robb provided Investor A a

4   virtual currency address to send his initial $100,000

5   investment.  On or about September 8, 2023, Robb

6   sent -- Investor A sent to Robb approximately $100,000.

7   On September 26 and 27 and October 2, the funds

8   provided by Investor A were transferred into Robb's

9   Coinbase account from which he was then able to

10  transfer funds to his traditional bank account.

11          In the days between September 8 and

12  September 26 and in the weeks and months that followed,

13  Robb repeatedly promised Investor A that the MEV bot

14  would be launched shortly and then subsequently

15  provided multiple excuses for why the MEV bot had not

16  yet launched.  At no point did Robb reveal to

17  Investor A that he had used Investor A's funds and/or

18  other investors' funds to fund his personal expenses.

19          On or about October 27, 2023, Robb told

20  Investor A that a new investor was interested in making

21  a $300,000 investment in the MEV bot.  He told

22  Investor A that such an investment would dilute

23  Investor A's profits, so he was giving Investor A the

24  chance to make an additional investment in the MEV bot,

25  which he said would also insulate Investor A even

1  further by spreading out the small risk profile

2  associated with the bot.  This was false because Robb

3  had already spent Investor A's previous investment on

4  personal expenses.  So an additional investment would

5  not and could not dilute any profits or insulate

6  Investor A in any way.  And further deposits from

7  Investor A would, at best, serve to replace funds Robb

8  had misused and thereby conceal Robb's misuse of

9  Investor A's initial investment.

10         Robb also told Investor A the MEV bot would

11  launch in the next week or so.

12         On or about October 28, 2023, Investor A sent

13  an additional $50,000 to an Ethereum virtual currency

14  address provided by Robb.

15         On or around November 8, 2023, Investor A

16  requested a refund from Robb because they had not

17  received any returns or evidence that Robb had created

18  a MEV bot.  Robb provided multiple excuses for why he

19  could not immediately refund Investor A.  Despite Robb

20  repeatedly promising his refund by various dates,

21  Investor A never received a refund from Robb, nor

22  profits from the MEV bot.

23         The government's investigation identified

24  more than ten investors in Robb's scheme alleging

25  losses totaling more than $2.2 million.  The investor

1  complaints include allegations of misrepresentations,

2  material omissions, and misuse of investor funds for

3  personal expenses similar to the misrepresentations and

4  omissions previously discussed.

5          The earliest reported complaint is from

6  Investor B, who received a message from Robb in

7  October 2022 seeking an investment.  From in and around

8  November 2022 to June 2023, Investor B invested a total

9  of approximately $514,000 with Robb.  Through its own

10 review of financial records and interviews with

11 investors, the FBI has identified at least $1.5 million

12 in funds that is either confirmed or believed were from

13 investors.

14         Despite Robb's representations to investors

15 claiming investor funds will be used as trading capital

16 for the MEV bot, the investor funds were funneled to

17 virtual currency exchange accounts and traditional bank

18 accounts held in Robb's name and not used as trading

19 capital for the MEV bot.

20         Contrary to Robb's promises that the funds

21 would be used to invest or otherwise in connection with

22 the MEV bot, the vast majority of the funds were, in

23 fact, used to pay for personal expenses, including

24 airline tickets, vacations, gambling, cars, and other

25 luxury items.  Several examples of specific expenses

1   are included in the statement of facts.

2           At no point before or after investors decided

3   to send him money did Robb inform current or

4   prospective investors that he used investors' money to

5   fund personal expenses or that he would do so.

6           This statement of facts includes only those

7   facts necessary to support the plea agreement and does

8   not include every fact known to the defendant or the

9   United States.

10          THE COURT:  Would you come to the podium,

11  please, Mr. Robb.

12          Do you disagree with anything the government

13  has told the Court about your conduct?

14          THE DEFENDANT:  No, Your Honor.

15          THE COURT:  I understand you've also signed a

16  written statement of facts.  Is that correct?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Do you have that document in

19  front of you?

20          THE DEFENDANT:  I do.

21          THE COURT:  Your signature appears on that

22  document, and you signed that document; is that

23  correct?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Did you read, understand, and

1  have all your questions answered about that written

2  statement of facts?

3         THE DEFENDANT:  Yes.

4         THE COURT:  Did anyone threaten you or try to

5  influence you in any way into signing that written

6  statement of facts against your will?

7         THE DEFENDANT:  No, Your Honor.

8         THE COURT:  Are the statements in that

9  written statement of facts true and correct?

10        THE DEFENDANT:  Yes.

11        THE COURT:  And is it your decision to enter

12 a guilty plea here today because you're, in fact,

13 guilty of what you've been charged with?

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  Ms. Bedell, based on everything

16 you know, is there an adequate basis for the plea in

17 this case?

18        MS. BEDELL:  Yes, Your Honor.

19        THE COURT:  Before pleading to the criminal

20 information, would you like to speak with your lawyer

21 any further?

22        THE DEFENDANT:  No, Your Honor.

23        THE COURT:  With respect to the charge of

24 wire fraud, in violation of Title 18, United States

25 Code, Section 1343, how do you plead?  Guilty or not

1  guilty?

2         THE DEFENDANT:  Guilty.

3         THE COURT:  Let the record reflect based on

4  the responses of this defendant to the Court's

5  questions, representations of counsel for the

6  government and for the defendant, it's the finding of

7  this Court in the case of *United States v. Robert*

8  *Wesley Robb* that the defendant is fully competent and

9  capable of entering an informed plea, that the

10 defendant is aware of the nature of the charges and the

11 consequences of the plea, and that the plea of guilty

12 is a knowing and voluntary plea supported by an

13 independent basis in fact containing each of the

14 essential elements of the offense.  The plea is

15 therefore accepted, and the defendant is now adjudged

16 guilty of that offense.

17         Ms. Robb, I'm not going to sentence you

18 today.  I'm going to set this matter down for

19 sentencing on September 11 at 9:00 a.m. in this

20 courtroom.

21         Between now and then, you will have the

22 opportunity to be interviewed by a representative of

23 pretrial services and probation.  That will be an

24 opportunity for you to share with that office and,

25 through that office, this Court any information you

1  think will be helpful to the Court in deciding what an

2  appropriate sentence is, and you may be accompanied by

3  your lawyer during that interview.

4          All right.  Why don't you have a seat for a

5  moment.

6          MS. RIGBY:  Your Honor, two things.  The

7  parties would like to hand up the information to which

8  Mr. Robb just pled guilty.  It has one change to the

9  one submitted to chambers.  So we wanted to make sure

10  the correct one was filed.

11          THE COURT:  All right.

12          MS. RIGBY:  Just for the record, the only

13  thing that was changed was that the forfeiture notice

14  included a specific reference to a stadium suite, and

15  that's been removed.

16          THE COURT:  All right.

17          MS. RIGBY:  So with the assistance of the

18  court security officer, I'll hand that up just to make

19  sure the right one is filed.

20          THE COURT:  All right.

21      (A document is passed up to the Court.)

22          MS. RIGBY:  Your Honor, having conferred with

23  government counsel about their schedules, I would ask

24  the Court if a later date could be set only -- I have a

25  very complicated tax sentencing that week --

```
 1              THE COURT:  For the sentencing?

 2              MS. RIGBY:  Yes, Your Honor.

 3              -- followed by a fraud one the next week.  I

 4  apologize.

 5              THE COURT:  All right.

 6              MS. RIGBY:  If there were any way to move it

 7  to October --

 8              THE COURT:  I could do it October 2.

 9              MS. RIGBY:  I would make that work, Your

10  Honor.

11              THE COURT:  All right, October 2.

12              MS. RIGBY:  Okay.

13              THE COURT:  Mr. Robb, I've rescheduled the

14  sentencing hearing for October 2.

15              All right.  The defendant has also filed a

16  motion for release pending sentencing, essentially an

17  appeal from Judge Fitzpatrick's detention order.  I've

18  reviewed the briefing.

19              Ms. Rigby, do you want to represent anything

20  further on this?

21              MS. RIGBY:  I do, Your Honor.

22              THE COURT:  Yes.

23              MS. RIGBY:  First, I want to especially

24  stress that some of the information in the government's

25  opposition -- please let me know if the Court can't
```

1 hear me.  I wanted to address some of the new

2 information in the government's opposition, Your Honor.

3             THE COURT:  All right.

4             MS. RIGBY:  As the Court knows, government

5 counsel filed Exhibit 1.  I want to stress this was not

6 provided until after we filed the motion.  I think the

7 Court can tell from the exhibit itself that the

8 information came in on June 20, the same date that I

9 filed the motion.

10             I had asked for the basis for the

11 government's assertions earlier that Mr. Robb had made

12 threats, and that is how I came to Exhibits 2 and 3 to

13 my motion and to my understanding of the scope of

14 anything related or similar to threats.

15             Government counsel had affirmed that they

16 were not aware of any threats to other's physical

17 safety at the time we spoke on June 20, I think.  And

18 now all of a sudden this comes in.  Now, I just want to

19 make sure that the Court understands I was not holding

20 back on that, number one.

21             THE COURT:  I understand.

22             MS. RIGBY:  And number two, Your Honor, I

23 think the timing of it is relevant to how much weight

24 it should be given.  I, frankly, think there's a good

25 deal of reason to doubt what's in that email from this

1  witness.   Number one, it's secondhand, and I think the

2  government sort of acknowledges that by putting it in

3  the footnote, right.   So this witness is saying that

4  another person told them that Mr. Robb had made a

5  threat to kill this witness and his mother.   So

6  secondhand first of all.

7         Secondly, that the person allegedly reporting

8  this, I will note for the Court, is a convicted felon.

9  He has been convicted in federal court of uttering

10  counterfeit securities.   He's been convicted in state

11  court of several fraudulent acts, such as passing bad

12  checks.   He's been trespassed from casinos.   He's been

13  sued.   He's sued everybody else.   He's been banned from

14  casinos in at least one state that I know of,

15  Pennsylvania, and that's a public record, Your Honor.

16         I don't believe he claims to be a victim of

17  this scheme, but he has been very intent on going after

18  Mr. Robb and helping the government make their case,

19  possibly to protect his own interests, Your Honor.   We

20  don't know.

21         So number one -- or I should say number two,

22  the source of this is highly suspect.   Secondly, the

23  witness himself claims he heard this several months

24  before Mr. Robb was arrested.   I don't recall the exact

25  date that this witness was interviewed by the FBI, but

1  he was interviewed by the FBI.  It is very hard to

2  believe that if he had what he considered a credible

3  threat against his own life and his mother's that he

4  did not report that until June 20, the day that

5  Mr. Robb asked for release again.  So I would ask the

6  Court to take that into consideration.

7          And in the end -- again, he says this is

8  several months before Mr. Robb was arrested.  There is

9  no evidence whatsoever that Mr. Robb actually took any

10  step to act on any supposed threat to this witness or

11  his mother or anybody else.

12          This witness also forwarded along a snippet

13  of a text that he attributes to Mr. Robb.  I don't know

14  where it comes from.  I don't know the context.

15  Mr. Robb does not specifically recall making it.

16          All of that, Your Honor, I think is reason to

17  give it little weight.  But the text itself, Your

18  Honor, says -- I forgot what it says -- something about

19  stomping on this person, who is the witness who sent

20  that email in Exhibit 1, Your Honor.

21          He says he's going to do this LOL.  I'm sure

22  the Court is familiar that.  That means "laugh out

23  loud."  So I think that suggests that it was not

24  serious as does the fact that it does not seem to have

25  been reported until June.

1          So coupled with the fact, again, Your Honor,

2   that Mr. Robb has not taken any steps to actually try

3   to harm anybody, I would ask the Court to give all of

4   this sudden information very little weight.

5          Your Honor, the government also points to a

6   jail call and says that Mr. Robb admitted on a recorded

7   phone call he is now careful to not be so explicit, of

8   course, referring to the fact that he was alleged to

9   have made threats in the past.

10          I asked government counsel what call that

11   was.  I listened to it again today.  The context is --

12   first of all, that's not a quote at all.  Secondly,

13   that call was Mr. Robb explaining to his sister that a

14   prosecutor in Nevada had said in court that he had

15   threatened people in this case, in this context

16   presuming.  And he was very upset about it, and he was

17   strenuously denying that that's what he had done.  It

18   was not in any way suggesting, as I think this

19   opposition does, "Hey, listen, don't worry.  I'm

20   careful about how I make my physical threats."  He was

21   saying, "I have not made any physical threats at all."

22          He said, "I was very careful.  Ever since my

23   last thing" -- referring to his old case -- "I have

24   never threatened anyone."  That's what he said, Your

25   Honor.  He was not suggesting that he's covering for --

1  he's not making veiled threats.  He's denying that he

2  makes physical threats against people.

3          And again, Your Honor, no matter what he

4  said, no matter what he said in chats -- we all know we

5  will say a lot of things online that we will not

6  actually do.  There's no evidence whatsoever that he's

7  ever actually tried to harm anybody physically.

8          Second, Your Honor -- and I will move on --

9  the conditions we propose would ensure he does not

10 present a threat to anybody, physically or otherwise.

11         The serious conduct, the government

12 reiterates that he has pled guilty.  We understand

13 that.  These are serious allegations.  He's admitted

14 that.  All of that is true, but that's not the question

15 before the Court.  The question is whether he will be a

16 danger or abscond before sentencing under the

17 conditions we propose, and he will not be able to do

18 that under the conditions we propose, Your Honor.

19         I understand he will be punished.  He

20 understands that.  He's agreed to recommend a certain

21 sentence.  But until that time, he has a right to be at

22 liberty if there are conditions that can ensure the

23 safety of the community -- and we believe there are --

24 and that can assure he will reappear.  We believe there

25 are.

1          Really, the government has no response to the

2   evidence that since 2005, Mr. Robb has not violated any

3   conditions or to the fact that when he did violate

4   conditions when he was on supervised release 20 years

5   ago, which was a very long time ago, he wasn't under

6   any of the kind of conditions that we're proposing.

7          No matter what the government can say about

8   him -- they can say he has confessed to committing a

9   fraud recently.  They can't say that there's evidence

10  of willful or of any violations of court orders in

11  going on 20 years.

12         And, Your Honor, I just would -- I'm not

13  going to repeat everything in the motion.  I know the

14  Court has read that.

15         THE COURT:  I have read it.

16         MS. RIGBY:  Thank you, Your Honor.

17         But the last thing I would say is that his

18  sister is a perfectly good third-party custodian.  I

19  did not ask for -- I don't know exactly where the

20  quotes come from where she's saying this is unfair,

21  this is ridiculous, or whatever she's saying.  I will

22  say in the call I listened to again today where

23  Mr. Robb is upset about what's happening in the bond

24  hearings, she doesn't make comments like that.

25         So I suspect -- I don't know -- that she may

1   have been responding to that, and I know that's been a

2   continuing concern for Mr. Robb.  So very likely she's

3   been responding to that going on and that concern being

4   that he has been misrepresented as making physical

5   threats about people, which he denies.

6          Further, Your Honor, sympathetic responses to

7   somebody sitting in a jail cell does not mean that she

8   will not abide by the Court's requirements of a

9   third-party custodian.  Everything else about her

10  character suggests that she will.

11         And if she is sympathetic to Mr. Robb, she

12  will understand, as does he, that the best thing he can

13  do for himself is follow the conditions, show that he

14  can do that, come back to court, do no further harm,

15  and get the best sentence he can.

16         And so, Your Honor, I think she's a perfectly

17  good third-party custodian.  I don't think these

18  sympathetic remarks should weigh heavily in the Court's

19  consideration.

20         And for all the reasons in the motion, we do

21  ask that the Court release Mr. Robb.

22         THE COURT:  All right.  Thank you.

23         Ms. Bedell.

24         MS. BEDELL:  Your Honor, this is the

25  defendant's third attempt at release.  As Judge

1  Fitzpatrick noted, the defendant's history, his

2  pattern, the strength of the evidence all counseled in

3  favor of keeping him detained.  That was when the

4  government had the burden.  Since then, the only thing

5  that has changed is that the burden has shifted and

6  that Mr. Robb has now pled guilty to the charge.

7          We outline our key arguments in the brief,

8  but there are a few points I wanted to elaborate on.

9          As we mentioned -- obviously, you're very

10  familiar with the facts having just gone through the

11  statement of facts.  I mentioned in the brief that the

12  fraud was ongoing at the time of his arrest.  So he did

13  not abandon his criminal conduct out of the goodness of

14  his heart.

15          I also wanted to highlight that Mr. Robb at

16  the time was beginning to solicit funds for a new

17  investment.  Now, the government hasn't been focused on

18  this investment, but it did follow a lot of the

19  patterns that we see in the present case, which was

20  that he had made a lot of promises about how fast a new

21  token would be coming out and how much money everyone

22  could make.  But the difference was until right at the

23  end, he wasn't actually soliciting investments for

24  that.  So we do have significant concerns that he has

25  multiple schemes going out there; though, again, that

1    has not been the focus of our investigation given the

2    limited funds he solicited from investors to this

3    point.

4           As you're aware, this is his third

5    conviction.  All of these prior convictions are for

6    fraud.  The magistrate judge in Nevada noted the

7    similarity between the conduct at issue here and the

8    conduct at issue in his past convictions except that

9    the defendant was getting more sophisticated.  There's

10   no indication, Your Honor, that he has learned his

11   lesson despite the time that has passed.

12          His prior experience on supervised release is

13   also highly informative and has been a significant

14   concern for both of the magistrates who hear this to

15   date.  Judge Fitzpatrick found a complete inability on

16   willingness to comply with orders of the court in the

17   past and an abysmal failure when he was on supervised

18   release for the first time.

19          Now, he has not had a supervised release

20   violation since 2005, but he, I think, only spent about

21   six months on supervised release after being released

22   from his second term of incarceration for the offense.

23          During his first unsuccessful period of

24   supervised release, though, he left the district

25   without approval.  He did not notify his officer about

1  a change of residence.  He failed to report to

2  probation, and he absconded.  Most notably, he

3  committed his other fraud offense while on supervised

4  release for his first fraud offense.

5          Since then, he has no stable employment.  He

6  has had limited other income, some of which is of

7  questionable legitimacy.  He had no stable home.  He

8  was hopping from casino to casino and gambling while

9  being comped for hotel rooms.  We believe he may still

10  have access to vehicles and other assets that he could

11  sell for cash.

12          I do want to address the threats as well.

13  Judge Fitzpatrick was correct in noting that Mr. Robb

14  did make explicit threats to victims.  This is similar

15  to prior offenses.  Now, at the time, neither the

16  government nor Judge Fitzpatrick were aware of explicit

17  threats of violence, and I don't believe that's what

18  anyone's argument was about at the time.  But the

19  suggestion that these other threats were simply about a

20  lawsuit or is really an incredible claim, Mr. Robb was

21  acting erratically claiming that investors were

22  conspiring to murder him.  He told investors that he

23  can, quote, track you even if they were trying to

24  conceal their identity.  And these are people operating

25  online under monikers.

1          He says that he knows their names, that he

2     knows where they live.  He sent an investor his own

3     address.  When that happens, someone who is interacting

4     with a convicted criminal who has stolen their money

5     does not first think, oh, he must be trying to serve me

6     a subpoena.  That is, of course, not how the investors

7     in this case understood those threats either.

8          One victim said that he believed Mr. Robb

9     was, in fact, trying to intimidate him, and another

10    victim understood these as a veiled threat.  Again,

11    that's just referring to the address and name and

12    saying, "I know where you live and who you are."

13         Now, he did make explicit threats to sue

14    investors.  Frankly, the investors did not react with

15    particular concern about those threats because, of

16    course, the idea that the guy who is scamming you is

17    going to sue you, it's not really the scariest threat.

18    But they were concerned about his erratic behavior and

19    his strange paranoia and the threats that were veiled

20    threats about knowing where they live.

21         Since then, we have learned about this

22    additional information, this threat from an investor --

23    excuse me, a threat received by an investor.  Ms. Rigby

24    is correct.  We were speaking with a victim yesterday

25    who was exercising his right to consult with the

1  government when he was learning about the plea and had

2  questions.  He mentioned that he was interested in the

3  outcome of today's detention hearing because if Mr Robb

4  was released, he was interested in seeking a

5  restraining order.  I asked what the basis for that

6  concern was, and this is the email that we received

7  detailing it.

8          So, you know, the threats on the investor and

9  his mother's life, we don't have the direct proof for

10 that.  That is several layers of hearsay.  But what it

11 does do is explain some of the context in which the

12 investors would have been hearing these threats.

13         I left this out when I read the statement of

14 facts, but PokerBrat2019 is one of the defendant's

15 acknowledged monikers that he used online.  It's clear

16 these texts come from that.

17         If you compare the background and the little

18 symbol that's used for these texts, it's the same as in

19 the statement of facts.  So suddenly disclaiming -- I

20 have no idea where these came from.  Because I don't

21 remember it, it means I must not have done it.  That's

22 simply not credible when this is supported by the

23 statement of facts.

24         And do I believe that Mr. Robb was literally

25 intending to curb-stomp an investor?  No.  I think

1   there was some degree of posturing there.  But again,

2   he is threatening violence, and that certainly provides

3   the context for when he makes statements like, "We can

4   track you.  I can track you, and I know where you

5   live."

6           I do also want to address the conditions of

7   release.  This is a crime, it's clear, that can be

8   committed from home sitting in your sister's basement,

9   and it's extremely easy for defendants, particularly

10  sophisticated defendants, to procure devices.

11          I have a defendant who lives in rural Maine

12  who keeps getting devices, and he hides them under a

13  tree.  We see this regularly with child exploitation

14  defendants.  Electronic monitoring is only after the

15  fact and only works for devices that the government and

16  probation knows about.

17          He has no meaningful ties to the community

18  beyond his sister.  He has not lived there.  He doesn't

19  seem to have any other meaningful relationships with

20  his relatives there.  And while his sister is no doubt

21  a very nice person, she does appear to have fallen

22  victim to Mr. Robb's, frankly, self delusion and his

23  manipulative behavior.

24          When you listen to these jail calls, he is

25  going on to anyone who will listen, including his

1   sister, about how everyone but him is responsible.  So

2   the prosecutors are lying.  He wasn't just upset that

3   the prosecutors had accused him of making threats.  He

4   was upset that they had lied because, of course, it had

5   to be lie.  He was upset that the FBI had been lying

6   and the affidavit was full of lies.  Everyone is out to

7   ruin his life.  I can't remember if it was the

8   prosecutors to be honest with the agents, but they're

9   evil in carnet.  At one point, he said, "Basically, I'm

10  being persecuted for my last case 20 years ago.

11  There's no evidence."

12          And the sister falls for this.  She believes

13  he is the victim.  This is so unfair.  This is so

14  unfair.  I don't know why they're picking on you.  This

15  is ridiculous.  This is so unfair.  It's so

16  unbelievable.  Why are you doing this to my brother?

17  It's so wrong.  It's not your fault.  It's unfair.  You

18  had no problems in 16 years, and then all of a sudden

19  they arrest you.

20          It's clear that those messages are across two

21  different days.  Those conversations are from two

22  different days.  It's not just reacting to allegations

23  of threats.  Now, I will say that Mr. Robb's

24  brother-in-law does appear to be somewhat more

25  skeptical of Mr. Robb's claims, but he is not home

1   during the day.  And I don't think that that is a

2   sufficient deterrent on supervision to ensure that he

3   does not access devices or otherwise pose a risk to the

4   community.

5          Unless there are other questions, Your Honor,

6   I'll rest on our briefing.

7          THE COURT:  All right.  Ms. Rigby.

8          MS. RIGBY:  Just a few brief responses, Your

9   Honor.

10          First, I would ask the Court to consider not

11  just what the magistrate judges found in two prior

12  proceedings but what is before the Court today.  There

13  are several things that are different today.  The first

14  of those -- or I'd say one of the most important is

15  that the record is now more complete and clear than it

16  was for either of those judges.  In particular, with

17  regard to this threat issue.

18          And second, although Mr. Robb fully

19  understands, his exposure is the same.  The government

20  has now agreed to cap their recommendation.  That, of

21  course, is going to weigh on him just as it would if

22  there were not one.  That's a fact of life.  That's

23  very practical and true.

24          Your Honor, in terms of whether he was

25  continuing anything up until the time of his arrest or

1  anything else that he did in the past, that was not

2  when he was under the conditions that we're proposing.

3          I don't know what the facts were of these

4  cases where this guy is hiding it under the tree.  I

5  don't know if he has a third-party custodian. I don't

6  know if he has location monitoring.  I don't know if

7  the court banned devices altogether.  We don't know any

8  of the details of those cases.  I'm not familiar with

9  that many child exploitation defendants getting out on

10 bond in the first place.

11          The question before the Court is would this

12 particular third-party custodian in rural Nevada on

13 seven acres far away from town -- she's an LDS member.

14 She's going to be home all day long.  Her husband is

15 going to be home in the evening.  She's going to lock

16 up her devices.  She's going to hold her keys.  The

17 question is under all of those circumstances, is

18 Mr. Robb likely to reoffend or threaten anybody or do

19 anything.  Our position is he is not.

20          So I'm not going to address every single

21 little thing.  That is the issue:  Can the conditions

22 do the trick?  We believe they can.

23          Thank you.

24          THE COURT:  All right.  Thank you.

25          The defendant has filed a motion for release

1  pending sentencing pursuant to Section 3143,

2  essentially appealing the magistrate judge's decision

3  to detain Mr. Robb.  This proceeding is a *de novo*

4  consideration of the evidence that's presented to the

5  Court.

6          The one difference, obviously, is that the

7  burden has shifted.  Mr. Robb has now pled guilty,

8  which from a sentencing perspective evidences an early

9  acceptance of responsibility.  But nevertheless, for

10 the purposes of determining whether he should be

11 released pending sentencing, it does shift the burden

12 to the defendant to establish by clear and convincing

13 evidence that he is not likely to flee or pose a danger

14 to the safety of any other person or the community.

15         The Court has reviewed the record both before

16 the magistrate judge and also as that record has

17 changed or been expanded upon in this court.  The Court

18 has reviewed the defendant's submissions and its

19 response to the evidence that was presented before the

20 magistrate judge.

21         In determining whether or not the defendant

22 has met his burden, the Court has considered an entire

23 range of factors, including the defendant's own

24 criminal history, his prior supervised release

25 violations and revocation, his mental health issues

1 that have been put in the record, but also the

2 disposition for any continued criminal activity and the

3 extent to which the proposed conditions could

4 effectively restrain any possible activity in that

5 regard.

6 　　　　　The Court has also considered the location of

7 the proposed home confinement and the issues that may

8 associate with that, as well as the defendant's

9 connection to that.  But more generally, the ability of

10 any conditions to effectively restrain the defendant

11 from engaging in any kinds of activity that would

12 constitute a danger to the community or establish some

13 ability on his part to not appear.

14 　　　　　Without indicating whether or not the Court

15 were to reach the same decision as the magistrate

16 judge, the issue here is whether the evidence is clear

17 and convincing.  The Court simply can't conclude, based

18 on this record, by clear and convincing evidence that

19 the defendant is not likely to flee or pose a danger to

20 the safety of any other person or the community based

21 on the conditions proposed.  Therefore, the Court is

22 going to deny the motion.  The defendant will remain

23 detained pending sentencing.

24 　　　　　Anything further?

25 　　　　　MS. BEDELL:  Nothing from the government,

1  Your Honor.

2            MS. RIGBY:  No, Your Honor.

3            THE COURT:  All right.  Counsel is excused.

4            The defendant is remanded.

5            The Court will stand in recess.

6            -----------------------------------
                    Time:  3:22 p.m.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21       I certify that the foregoing is a true and

22   accurate transcription of my stenographic notes.

23

24                                    /s/
                              _____
25                            Rhonda F. Montgomery, CCR, RPR